United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 18, 2001 Decided March 26, 2002 

 No. 97-1440

 American Trucking Associations, Inc., et al., 
 Petitioners

 v.

 Environmental Protection Agency, 
 Respondent

 Commonwealth of Massachusetts, et al., 
 Intervenors

 Consolidated with 
 97-1546, 97-1548, 97-1551, 97-1552, 97-1553, 97-1555, 
 97-1559, 97-1561, 97-1562, 97-1565, 97-1567, 97-1571, 
 97-1573, 97-1574, 97-1576, 97-1578, 97-1579, 97-1582, 
 97-1585, 97-1586, 97-1587, 97-1588, 97-1592, 97-1594, 
 97-1596, 97-1597, 97-1598

 ---------

 No. 97-1441

 American Trucking Associations, Inc., et al., 
 Petitioners

 v.

 Environmental Protection Agency, 
 Respondent

 Commonwealth of Massachusetts, et al., 
 Intervenors

 Consolidated with 
 97-1502, 97-1505, 97-1508, 97-1509, 97-1510, 97-1512, 
 97-1513, 97-1514, 97-1518, 97-1519, 97-1526, 97-1531, 
 97-1539, 97-1566, 97-1568, 97-1570, 97-1572, 97-1575, 
 97-1584, 97-1589, 97-1591, 97-1595, 97-1619

 On Remand from the United States Supreme Court 

 F. William Brownell and Norman W. Fichthorn argued 
the causes for State and Business Petitioners, Non-Environ-
mental Petitioners, and Petitioners on Ozone Issues in 
97-1440 and 97-1441. With them on the briefs were Henry 
V. Nickel, Thomas Richichi, Betty D. Montgomery, Attorney 
General, Judith L. French and Bryan F. Zima, Assistant 
Attorneys General, State of Ohio, Jennifer M. Granholm, 
Attorney General, Thomas Casey, Solicitor General, Alan F. 
Hoffman and Pamela J. Stevenson, Assistant Attorneys Gen-
eral, State of Michigan, Mark J. Rudolph, Senior Counsel, 

State of West Virginia Department of Environmental Protec-
tion, Robert R. Gasaway, Daryl Joseffer, David E. Menotti, 
Jeffrey A. Knight, G. William Frick, M. Elizabeth Cox, Robin 
S. Conrad, Jan Amundson, Beth L. Law, Robert S. Digges, 
Harold P. Quinn Jr., David M. Flannery, Gale Lea, Russell 
S. Frye, Richard Wasserstrom, Julie C. Becker, Jeffery L. 
Leiter, Chet M. Thompson, Douglas I. Greenhaus, Maurice 
H. McBride, Gary H. Baise, David F. Zoll, Ronald A. 
Shipley, Peter S. Glaser, Grant Crandall, Timothy L. Hark-
er, Eugene M. Trisko, Thomas J. Graves, Kurt E. Blase, 
Erika Z. Jones, Timothy S. Bishop, Adam C. Sloane, Duane 
J. Desiderio, and David M. Friedland.

 Robert E. Yuhnke argued the cause for Environmental 
Group and Citizen Petitioners in 97-1440. With him on the 
briefs was Joy E. Herr-Cardillo.

 James M. Rinaca, Robert R. Gasaway and Daryl Joseffer 
were on the brief of intervenors Atlantic City Electric Com-
pany and American Road and Transportation Builders Associ-
ation in 97-1440 and 97-1441.

 Norman L. Rave Jr. and David J. Kaplan, Attorneys, U.S. 
Department of Justice, argued the causes for respondent in 
97-1440 and 97-1441. With them on the briefs were John C. 
Cruden, Assistant Attorney General, Thomas A. Lorenzen, 
Attorney, John Hannon, Gerald Gleason, Carol S. Holmes 
and Steven Silberman, Attorneys, U.S. Environmental Pro-
tection Agency.

 Thomas F. Reilly, Attorney General, Edward G. Bohlen, 
Assistant Attorney General, Commonwealth of Massachu-
setts, John J. Farmer Jr., Attorney General, Howard Gedul-
dig, Deputy Attorney General, State of New Jersey, Eliot 
Spitzer, Attorney General, J. Jared Snyder, Assistant Attor-
ney General, State of New York, Philip T. McLaughlin, 
Attorney General, Maureen D. Smith, Senior Assistant Attor-
ney General, State of New Hampshire, William Sorrell, 
Attorney General, Erick Titrud, Assistant Attorney General, 
State of Vermont, Richard Blumenthal, Attorney General, 
Kimberly Massicotte, Assistant Attorney General, State of 

Connecticut, and Howard I. Fox were on the brief for inter-
venors Massachusetts, New Jersey and American Lung Asso-
ciation, and amici curiae New York, et al. in 97-1440 and 
97-1441.

 Before: Ginsburg, Chief Judge, Tatel, Circuit Judge, and 
Williams, Senior Circuit Judge.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: In these consolidated cases, we 
consider challenges to the Environmental Protection Agency's 
National Ambient Air Quality Standards for particulate mat-
ter and ozone. Petitioners originally raised a broad range of 
issues, including the constitutionality of the Clean Air Act, the 
contours of EPA's authority to promulgate air quality stan-
dards, and the lawfulness of the challenged standards. We 
addressed many of these issues in an earlier ruling that the 
Supreme Court subsequently reversed in part and affirmed in 
part. On remand, only Petitioners' specific challenges to the 
air quality standards remain unresolved. Rejecting the argu-
ment that the language and reasoning of our earlier decision 
determine the outcome of these remaining claims, and finding 
the challenged air quality standards neither arbitrary nor 
capricious, we deny the petitions for review except to the 
extent the Supreme Court's and our earlier decisions require 
further action by EPA.

 I.

 The Clean Air Act, 42 U.S.C. ss 7401-7671q, directs the 
Environmental Protection Agency to establish and periodical-
ly review primary and secondary National Ambient Air Quali-
ty Standards ("NAAQS"), id. s 7409, for any pollutant the 
"emissions of which ... cause or contribute to air pollution 
which may reasonably be anticipated to endanger public 
health or welfare," id. s 7408(a)(1)(A). Section 109(b)(1) of 
the Act directs EPA to set the primary NAAQS at levels "the 
attainment and maintenance of which in the judgment of the 

Administrator, ... allowing an adequate margin of safety, are 
requisite to protect the public health." Id. s 7409(b)(1). 
Secondary NAAQS must be set at "level[s] ... the attain-
ment and maintenance of which in the judgment of the 
Administrator ... [are] requisite to protect the public welfare 
from any known or anticipated adverse effects...." Id. 
s 7409(b)(2). Under the Act, secondary NAAQS protect such 
aspects of the public "welfare" as "soils, water, crops, vegeta-
tion, manmade materials, [domesticated] animals, wildlife, 
weather, visibility, ... climate," and property values. Id. 
s 7602(h).

 The Act calls for the appointment of "an independent 
scientific review committee," the Clean Air Scientific Advisory 
Committee ("CASAC"), and tasks this committee with period-
ically reviewing the NAAQS and advising EPA of any need 
for new standards or for revisions to existing standards. 42 
U.S.C. s 7409(d)(2)(A), (B); see also Nat'l Ambient Air Quali-
ty Standards for Particulate Matter, 62 Fed. Reg. 38,652, 
38,653 (Jul. 18, 1997) (codified at 40 C.F.R. s 50.7 (1999)) 
("Particulate Matter NAAQS"). The seven-member commit-
tee comprises "at least one member of the National Academy 
of Sciences, one physician, and one person representing State 
air pollution control agencies." 42 U.S.C. s 7409(d)(2)(A). 
The Act directs CASAC to "advise the [EPA] Administrator 
of areas in which additional knowledge is required to appraise 
the adequacy and basis of existing, new, or revised 
[NAAQS]," and to "describe the research efforts necessary to 
provide the required information[.]" Id. s 7409(d)(2)(C). 
When EPA proposes to issue new or revise existing NAAQS, 
it must "set forth or summarize and provide a reference to 
any pertinent findings, recommendations, and comments by 
[CASAC]." Id. s 7607(d)(3). If the proposed rule "differs in 
any important respect from any of [CASAC's] recommenda-
tions," the Agency must provide "an explanation of the rea-
sons for such differences." Id.

 Once EPA establishes NAAQS for a particular pollutant, 
the standards become the centerpiece of a complex statutory 
regime aimed at reducing the pollutant's atmospheric concen-
tration. EPA and the States must first designate areas of 

the country that fail to meet the standards--that is, areas in 
which atmospheric concentrations of the pollutant exceed 
allowable levels. 42 U.S.C. s 7407(d)(1)-(2). Each State 
must then adopt a plan that "provides for implementation, 
maintenance, and enforcement of [the] primary" NAAQS, id. 
s 7410(a)(1), through, for example, regulation of wood fires or 
automobile or power plant emissions. States must submit 
their plans to EPA for approval, and may have to make 
revisions if the Agency finds the plans inadequate. States 
that fail to develop adequate plans are subject to sanctions, 
id. s 7509, or to imposition of a federal implementation plan, 
id. s 7410(c)(1).

 These consolidated cases concern NAAQS for particulate 
matter and ozone, two ubiquitous atmospheric pollutants. 
The term "particulate matter," or "PM," refers to all "solid 
particles and liquid droplets found in air." Office of Air & 
Radiation, U.S. Envtl. Prot. Agency, EPA-454/R-00-005, Air 
Quality Index: A Guide to Air Quality and Your Health 11 
(2000) ("EPA, Air Quality Index"). Although these particles 
and droplets come in varying sizes, only particulate matter 
less than 2.5 micrometers in diameter--so-called "fine PM" or 
"PM2.5"--is relevant here. As originally filed, these cases 
also concerned "coarse" particulate matter, or particles and 
droplets between 2.5 and 10 micrometers in diameter, but we 
resolved all issues relating to this "coarse particulate matter" 
in our earlier ruling. See Am. Trucking Ass'ns v. EPA, 175 
F.3d 1027, 1053-55 (D.C. Cir. 1999) ("ATA I"), reh'g granted 
in part and denied in part, 195 F.3d 4 (D.C. Cir. 1999) ("ATA 
II"), aff'd in part and rev'd in part, Whitman v. Am. Truck-
ing Ass'ns, 531 U.S. 457 (2001) ("Whitman").

 PM2.5 is associated with a range of adverse health effects 
such as coughing; shortness of breath; aggravation of existing 
respiratory conditions like asthma and chronic bronchitis; 
increased susceptibility to respiratory infections; and height-
ened risk of premature death. EPA, Air Quality Index at 11. 
High PM2.5 concentrations also impair visibility, reducing 
people's "well-being ..., both where they live and work, and 
in places [like national parks and wilderness areas] where 
they enjoy recreational opportunities." Particulate Matter 

NAAQS, 62 Fed. Reg. at 38,680. Sources of fine PM include 
vehicle engines, power plants, and wood fires. EPA, Air 
Quality Index at 11.

 Unlike PM, ozone is a colorless, odorless gas. EPA, Air 
Quality Index at 7. Not a direct product of human activity, 
ozone forms when other atmospheric pollutants--ozone "pre-
cursors"--react in the presence of sunlight. Office of Air 
Quality Planning & Standards, U.S. Envtl. Prot. Agency, 
EPA/451-K-97-002, Ozone: Good Up High, Bad Nearby 2-3, 
(1997) ("EPA, Ozone Facts"). Significant health effects asso-
ciated with ozone pollution include coughing; throat irritation; 
aggravation of existing conditions like asthma, bronchitis, 
heart disease, and emphysema; and lung tissue damage. Id. 
Ozone pollution can also interfere with plants' ability to 
produce and store food, rendering them more susceptible to 
disease, insect pests, and other stressors. Id. EPA esti-
mates that ozone "is responsible for 500 million dollars in 
reduced crop production in the United States each year." Id. 
Ozone levels tend to be highest in urban areas, in part 
because cars, power plants, and chemical solvents are the 
principal sources of ozone precursors. Id.

 In EPA's judgment, ozone is, and PM may be, a non-
threshold pollutant--that is, a pollutant that causes adverse 
health effects at any non-zero atmospheric concentration. 
Nat'l Ambient Air Quality Standards for Ozone, 62 Fed. Reg. 
38,856, 38,863 (July 18, 1997) (codified at 40 C.F.R. ss 50.9, 
50.10 (1999)) ("Ozone NAAQS") ("Nor does it seem possible, 
in the Administrator's judgment, to identify [an ozone concen-
tration] level at which it can be concluded with confidence 
that no 'adverse' effects are likely to occur."); Nat'l Ambient 
Air Quality Standards for Particulate Matter: Proposed Rule, 
61 Fed. Reg. 65,638, 65,651 (Dec. 13, 1996) ("Particulate 
Matter NPRM") ("[T]he single most important factor influ-
encing the uncertainty associated with the risk estimates [for 
PM] is whether or not a threshold concentration exists below 
which PM-associated health risks are not likely to occur."); 
see also ATA I, 175 F.3d at 1034 (making the same point). 
The lack of a threshold concentration below which these 
pollutants are known to be harmless makes the task of setting 

primary NAAQS difficult, as EPA must "select ... standard 
level[s] that ... reduce risks sufficiently to protect public 
health" even while recognizing that "a zero-risk standard is 
[not] possible." Ozone NAAQS, 62 Fed. Reg. at 38,863.

 On July 18, 1997, EPA revised the primary and secondary 
NAAQS for particulate matter and ozone. See Particulate 
Matter NAAQS, 62 Fed. Reg. 38,652; Ozone NAAQS, 62 Fed. 
Reg. 38,856. For particulate matter, the Agency abandoned 
its approach of regulating both coarse and fine particles and 
droplets under the same standards. Observing that the 
"epidemiological evidence suggest[s] stronger associations of 
mortality and some morbidity effects with fine particles than 
with ... coarse particles," Nat'l Ambient Air Quality Stan-
dards for Ozone and Particulate Matter, Advance Notice of 
Proposed Rulemaking, 61 Fed. Reg. 29,719, 29,723 (June 12, 
1996) ("Advance NPRM"), the Agency adopted new, PM2.5-
specific standards: an annual primary standard of 15 micro-
grams per cubic meter ("ug/m3"); a daily primary standard of 
65 ug/m3; and secondary standards equal to the primary 
standards. Particulate Matter NAAQS, 62 Fed. Reg. at 
38,652.

 EPA also made significant changes to the ozone NAAQS. 
Citing new information that suggests a positive correlation 
between prolonged (six-to eight-hour) exposures to relatively 
low levels of ozone and "a wide range of health effects," 
Ozone NAAQS, 62 Fed. Reg. at 38,861, the Agency adopted 
new primary and secondary standards under which eight-
hour-average ozone concentrations may not exceed 0.08 parts 
per million ("ppm"), in place of the old, one-hour-average 
standards of 0.12 ppm, id. at 38,856.

 Soon after EPA issued the revised particulate matter and 
ozone NAAQS, various parties, including American Trucking 
Associations, other businesses and business associations, envi-
ronmental groups, citizens, and several States, petitioned for 
review of the revised standards. Other parties intervened 
(some supporting Petitioners and others supporting EPA), 
four additional States filed amicus briefs supporting EPA, 
and Senator Orrin Hatch and Representative Thomas Bliley 

filed amicus briefs supporting Petitioners. Petitioners and 
supporting Intervenors and Amici challenged the NAAQS 
from all sides, arguing (among other things) that the Clean 
Air Act delegates excessive legislative authority to EPA in 
violation of Article I of the Constitution and that the Agency 
failed to consider certain relevant factors, including imple-
mentation costs, prior to setting the NAAQS. Invoking 
Clean Air Act section 307(d)(9), which directs federal appeals 
courts to vacate Agency action "found to be ... arbitrary, 
capricious, an abuse of discretion, or otherwise not in accor-
dance with law," 42 U.S.C. s 7607(d)(9)(A), Petitioners also 
challenged specific aspects of the new particulate matter and 
ozone NAAQS ("the 307(d)(9) claims").

 We addressed most of these arguments in ATA I and II. 
With respect to the nondelegation argument, we agreed with 
Senator Hatch and Representative Bliley that neither the 
Act's requirement that EPA "set each [primary] standard at 
the level 'requisite to protect the public health' with an 
'adequate margin of safety,' " ATA I, 175 F.3d at 1034 
(quoting 42 U.S.C. s 7409(b)(1)), nor the Agency's interpreta-
tion of that requirement in the challenged rules, see id., 
identified an "intelligible principle" limiting EPA's rulemak-
ing authority, id. at 1034-40 (internal quotation marks omit-
ted). But see id. at 1057-62 (Tatel, J., dissenting); ATA II, 
195 F.3d at 14-16 (Silberman, J., dissenting from denial of 
rehearing en banc); id. at 16-17 (Tatel, J., same). Although 
we concluded that the Clean Air Act, as interpreted by EPA, 
effected an unconstitutional delegation of Congress's legisla-
tive authority, we struck down neither the Act nor the 
challenged NAAQS, choosing instead to remand the stan-
dards to the Agency to give it an opportunity to identify a 
determinate standard that would limit its discretion. ATA I, 
175 F.3d at 1038; see also ATA II, 195 F.3d at 6-8.

 Having remanded the challenged NAAQS for other rea-
sons, we never addressed Petitioners' 307(d)(9) claims. We 
did, however, address Petitioners' more general claims, hold-
ing that EPA: may not consider either the implementation 
costs or the indirect environmental consequences of NAAQS 
prior to setting the standards, ATA I, 175 F.3d at 1040-41; 

has no obligation to comply with certain requirements of the 
National Environmental Policy Act, the Unfunded Mandates 
Reform Act, or the Regulatory Flexibility Act before issuing 
NAAQS, id. at 1041-45 (citing NEPA, 42 U.S.C. 
s 4332(2)(C)-(D); UMRA, 2 U.S.C. ss 1532, 1535; and RFA, 
5 U.S.C. ss 603(a), 605(b)); should have considered any bene-
ficial effects of ozone before revising the ozone NAAQS, id. at 
1051-53; has only limited statutory authority to enforce the 
new ozone NAAQS, id. at 1046-51; see also ATA II, 195 F.3d 
at 8-10; need not identify the specific biological mechanism 
by which fine particulate matter affects human health, ATA I, 
175 F.3d at 1055-56; and has no obligation to set secondary 
NAAQS at levels "sufficient to eliminate all adverse visibility 
effects" of a pollutant, id. at 1056-57 (emphasis added).

 The Supreme Court granted certiorari with respect to four 
questions: whether the Clean Air Act violates the nondelega-
tion doctrine; whether EPA may consider implementation 
costs in setting NAAQS; whether this court had jurisdiction 
to review the Agency's interpretation of the Clean Air Act 
provisions governing implementation of the ozone NAAQS; 
and if this court had jurisdiction, whether the Agency's 
interpretation of those provisions was permissible. Whitman, 
531 U.S. at 462. Disagreeing with our nondelegation ruling, 
the Supreme Court held that the Clean Air Act requirement 
that EPA "set air quality standards at the level that is 
'requisite'--that is, not lower or higher than is necessary--to 
protect the public health with an adequate margin of safety, 
fits comfortably within the scope of [Agency] discretion per-
mitted by [Court] precedent." Id. at 475-76. Writing for the 
Court, Justice Scalia next confirmed our long-held view that 
" 'economic considerations [may] play no part in the promul-
gation of ambient air quality standards,' " id. at 464 (quoting 
Lead Indus. Ass'n v. EPA, 647 F.2d 1130, 1148 (D.C. Cir. 
1980)); see also ATA I, 175 F.3d at 1040-41 (making the 
same point), and agreed with ATA I that this court had 
jurisdiction to review EPA's interpretation of the Act's provi-
sions governing implementation of the ozone NAAQS, Whit-
man, 531 U.S. at 477-80. Turning to the merits of the latter 
issue, the Court found the Agency's ozone NAAQS "imple-

mentation policy to be unlawful" and indicated that after this 
court's final disposition of the parties' 307(d)(9) claims "it is 
left to the EPA to develop a reasonable interpretation of the 
nonattainment implementation provisions insofar as they ap-
ply to revised ozone NAAQS." Id. at 486.

 The Supreme Court remanded the cases for us to consider 
Petitioners' as-yet-unaddressed 307(d)(9) challenges to the 
particulate matter and ozone NAAQS. On remand, three 
sets of Petitioners filed additional briefs, two addressing the 
particulate matter NAAQS and one addressing the ozone 
NAAQS. With respect to the particulate matter NAAQS, one 
group of Petitioners, led by American Trucking Associations 
("State and Business Petitioners"), urges us to vacate the 
NAAQS under section 307(d)(9) because EPA "[f]ailed" either 
"to [a]rticulate and [a]pply" the Act's "requisite to protect" 
standard as elucidated in Whitman, State & Bus. Pet'rs' Br. 
at 35, or to determine PM2.5 levels "at which [the] public 
health risk is acceptable," id. at 40. The second group of 
PM2.5 Petitioners, led by Citizens for Balanced Transporta-
tion ("Environmental Petitioners"), believes that the daily 
primary standard is too lenient to protect against known 
adverse health effects of fine particulate matter and that the 
annual and daily secondary standards are insufficient to 
reduce visibility impairment. The third set of Petitioners, 
again led by American Trucking Associations ("Ozone Peti-
tioners"), challenges the ozone NAAQS on grounds similar to 
those raised by State and Business Petitioners in their attack 
on the particulate matter NAAQS.

 In considering these section 307(d)(9) claims, we apply the 
same highly deferential standard of review that we use under 
the Administrative Procedure Act, 5 U.S.C. s 706(2)(A). See, 
e.g., Allied Local & Reg'l Mfrs. Caucus v. EPA, 215 F.3d 61, 
68 (D.C. Cir. 2000) ("To determine whether [the Agency's] 
rules are 'arbitrary and capricious,' we apply the same stan-
dard of review under the Clean Air Act as we do under the 
Administrative Procedure Act."). Thus, we presume the va-
lidity of agency action as long as "a rational basis for it is 
presented." Lead Indus. Ass'n, 647 F.2d at 1145. That said, 
however, we perform a "searching and careful" inquiry into 

the underlying facts. Id. (internal quotation marks and cita-
tions omitted). In a similar case involving a challenge to 
ambient air quality standards, Lead Industries, we elaborated 
on this standard of review as follows:

 It is not our function to resolve disagreement among the 
 experts or to judge the merits of competing expert views. 
 Our task is the limited one of ascertaining that the 
 choices made by the [EPA] Administrator were reason-
 able and supported by the record. That the evidence in 
 the record may also support other conclusions, even 
 those that are inconsistent with the Administrator's, does 
 not prevent us from concluding that [her] decisions were 
 rational and supported by the record.
 
Id. at 1160 (internal citations omitted).

 II.

 Before evaluating the merits of Petitioners' claims, we must 
address State, Business, and Ozone Petitioners' argument 
that the language and reasoning of ATA I and II "govern[ ]" 
"the outcome of th[ese] case[s]." State & Bus. Pet'rs' Br. at 
32. In essence, these Petitioners argue that ATA I and II 
signal this court's belief that EPA failed to apply the Clean 
Air Act's "requisite to protect the public health" standard in 
setting the primary NAAQS. 42 U.S.C. s 7409(b)(1). Be-
cause EPA chose not to appeal this purported "holding" to 
the Supreme Court, Petitioners reason, the holding has be-
come the law of these cases and constrains our review of all 
remaining claims.

 Petitioners base this law of the case argument primarily on 
our statement in ATA II that although EPA's "petition for 
rehearing ... argue[d] that s 109 of the Clean Air Act 
contains [a] principle limiting the agency's discretion"--name-
ly, that the NAAQS must be set at levels "necessary for 
public health protection: neither more nor less stringent than 
necessary, but 'requisite' "--EPA never "identif[ied]" this 
principle "as a limit upon its discretion" anywhere in the 
challenged rules. 195 F.3d at 6-7 (internal quotation marks 
and citations omitted). In addition, Petitioners point to a 

later passage in ATA II in which we declined to "express [an] 
opinion upon the sufficiency of [the newly identified limiting] 
principle," choosing to wait until "after the [Agency] itself has 
applied [the principle] in setting a NAAQS" to determine 
"whether the principle, in practice, fulfills the purposes of the 
nondelegation doctrine." Id. at 7 (emphasis added). Finally, 
Petitioners cite the following sentences from ATA I:

 [The Agency's] explanations for its decisions amount to 
 assertions that a less stringent standard would allow the 
 relevant pollutant to inflict a greater quantum of harm on 
 public health, and that a more stringent standard would 
 result in less harm. Such arguments only support the 
 intuitive proposition that more pollution will not benefit 
 public health, not that keeping pollution at or below any 
 particular level is "requisite" or not requisite to "protect 
 the public health" with an "adequate margin of safety," 
 the formula set out by [Clean Air Act section 109(b)(1)'s 
 definition of a primary NAAQS].
 
175 F.3d at 1035. According to Petitioners, these passages 
express our view that EPA failed to follow the Clean Air Act 
in setting the PM and ozone NAAQS, and that the NAAQS 
themselves are therefore "arbitrary, capricious, an abuse of 
discretion, or otherwise not in accordance with law." 42 
U.S.C. s 7607(d)(9)(A).

 Petitioners misread ATA I and II. Both decisions address 
the broad claim that the Clean Air Act effects an unconstitu-
tional delegation of legislative authority. To evaluate that 
claim, we looked first to the Act for an "intelligible principle" 
limiting the Agency's "application of the[ ] factors" it "uses in 
determining the degree of public health concern associated 
with different levels of ozone and PM[.]" ATA I, 175 F.3d at 
1034 (internal quotation marks omitted). Finding none, we 
next looked to see whether the Agency developed "binding 
standards for itself." ATA I, 175 F.3d at 1038 (emphasis 
added). Again finding none, we remanded the NAAQS to 
EPA to give it "an opportunity to extract [from the Act] a 
determinate standard" that would "channel" its rulemaking 
authority. Id. at 1034, 1038; see also ATA II, 195 F.3d at 6-

8 (affirming that holding). At no point in either ATA I or II, 
however, did we address the narrower question now before 
us: Did EPA abuse its discretion or otherwise violate the 
Clean Air Act in setting the challenged NAAQS? Indeed, in 
ATA I we emphasized this very distinction:

 [The Agency] cites prior decisions of this Court holding 
 that when there is uncertainty about the health effects of 
 concentrations of a particular pollutant within a particu-
 lar range, EPA may use its discretion to make the 
 "policy judgment" to set the standards at one point 
 within the relevant range rather than another.... We 
 agree. But none of those panels addressed the claim of 
 undue delegation that we face here, and accordingly had 
 no occasion to ask EPA for ... a "principle[ ]" ... in 
 making its "policy judgment."
 
175 F.3d at 1037. As this language makes clear, we recog-
nized that the search for a binding principle guiding Agency 
policy judgments differs in kind and degree from the familiar 
administrative law inquiry into whether an agency abused its 
discretion. When we stated that EPA failed to "appl[y]" its 
newly identified limiting principle "in setting [the] NAAQS," 
therefore, we spoke in constitutional terms: In our pre-
Whitman view, EPA never agreed that it "could not (or in a 
later rulemaking would not)" promulgate a NAAQS either 
"more [ ]or less stringent than necessary." ATA II, 195 F.3d 
at 6-7 (emphasis removed). We in no way implied, however, 
that the particulate matter and ozone NAAQS themselves are 
either more or less stringent than necessary.

 In short, ATA I and II address only whether the Act (or 
EPA's reading of the Act) adequately limits the Agency's 
discretion. Here, we ask whether EPA reasonably exercised 
that discretion--an entirely different question that we now 
answer differently.

 III.

 We start with Petitioners' challenge to the PM2.5 NAAQS. 
Fulfilling our obligation to "undertake a 'substantial inquiry' 
into the facts" underlying challenged agency actions, Lead 

Indus. Ass'n, 647 F.2d at 1146 (quoting Citizens to Preserve 
Overton Park v. Volpe, 401 U.S. 402, 415 (1971), overruled on 
other grounds by Califano v. Sanders, 430 U.S. 99, 105 
(1977)), we first summarize the Agency's rulemaking process 
with respect to both the primary and secondary NAAQS and 
then consider State, Business, and Environmental Petitioners' 
specific arguments.

 The Rulemaking

 In late 1996, EPA issued a public notice of proposed 
rulemaking that announced possible changes to the particu-
late matter NAAQS. Particulate Matter NPRM, 61 Fed. 
Reg. 65,638. Most relevant to these cases, EPA said it 
planned to supplement the existing primary NAAQS, which 
regulated both coarse particulate matter and PM2.5 under a 
single set of standards, by adding two new primary standards 
specific to fine PM: an annual PM2.5 standard of 15 ug/m3 
and a daily PM2.5 standard of 50 ug/m3. Id. EPA sought 
comment on that proposal and on a range of alternative 
values for the new standards, from 12 to 20 ug/m3 for the 
annual standard, and 20 to 65 ug/m3 for the daily standard. 
Id. at 65,658-61. According to EPA, an annual standard of 
12 ug/m3 and a daily standard of 20-50 ug/m3 would be 
"maximally precautionary," id., at 65,659; by comparison, an 
annual standard of 20 ug/m3 and a daily standard of 65 ug/m3 
would reflect "the judgment that the current scientific evi-
dence has not demonstrated adverse public health effects 
from fine particle concentrations ... below those correspond-
ing to the [old, composite, PM] standard," id. Between those 
extremes, the proposed annual and daily levels of 15 and 50 
ug/m3, respectively, would reflect an effort "to limit annual 
PM2.5 concentrations to somewhat below those where the 
body of epidemiological evidence is most consistent and co-
herent." Id. at 65,660.

 To facilitate public input on the proposed changes, EPA 
established a toll-free telephone hotline and a system for 
submission of comments via the Internet. Particulate Matter 
NAAQS, 62 Fed. Reg. at 38,654. In addition, Agency staff 

conducted public hearings in communities across the country 
and held two national satellite telecasts. Id. By the end of 
the comment period, EPA had received more than 50,000 
comments. Id.

 In setting the final NAAQS, EPA considered these public 
comments, in addition to CASAC's recommendations and 
Agency staff's "thorough review ... of the latest scientific 
information on known and potential human health effects 
associated with exposure to PM." Id. at 38,655-56. EPA 
also considered an independent (though partially Agency-
funded) research institute's study of the correlation between 
particulate matter levels and mortality in six urban areas, the 
same institute's extended analyses of the mortality data for 
Philadelphia alone (the "Philadelphia studies"), see id. at 
38,660, and Agency staff's quantitative assessment of other 
PM-related health risks in Philadelphia and Los Angeles 
("risk assessment"), see id. at 38,656 (citing Office of Air 
Quality Planning & Standards, U.S. Envtl. Prot. Agency, A 
Particulate Matter Risk Assessment for Philadelaphia and 
Los Angeles (1996) ("Risk Assessment")). EPA emphasized, 
however, that it "place[d] greater weight on the overall 
conclusions derived from the[se] studies--that PM air pollu-
tion is likely causing or contributing to significant adverse 
effects at levels below those permitted by the [old] stan-
dards--than on the [more uncertain] concentration-response 
functions and quantitative risk estimates derived from them." 
Id.

 Ultimately, EPA adopted the proposed annual PM2.5 stan-
dard of 15 g/m3, explaining that it would assess compliance 
based on the three-year average of annual arithmetic mean 
PM2.5 concentrations at monitoring stations in a given area. 
See Particulate Matter NAAQS, 62 Fed. Reg. at 38,652. For 
the daily standard, EPA chose a less restrictive level than it 
had originally proposed, setting the standard at 65 ug/m3, 
with a "form"--or method of assessing compliance--based on 
the three-year average of the 98th percentile of daily PM2.5 
concentrations at each monitoring site. Id. EPA provided a 
lengthy explanation of its selection of these new standards, 
four aspects of which are relevant here: its discussions of (1) 
the need to revise the old NAAQS for particulate matter; (2) 

the reasons for adopting both annual and daily standards; (3) 
the grounds for choosing 15 and 65 ug/m3, respectively, as the 
levels for the new standards; and (4) the rationale behind the 
new daily standard's rather peculiar form.

 Explaining the first point--the need for the new PM2.5 
NAAQS--EPA began by documenting evidence of the old PM 
standards' inadequacy. Examination of an "extensive ... 
epidemiological data base," EPA observed, showed that chil-
dren, as well as the elderly and other "sensitive populations," 
were experiencing adverse, PM-related health effects--some-
times including mortality--even "in areas [and] at times when 
the levels of the [old] ... standards [were] met." Id. at 
38,657. In addition, a majority of CASAC members recom-
mended strengthening "the health protection[s] provided by 
the [old] PM standard[s]." Id. at 38,666. Finally, a majority 
of commenters agreed that "based on the available scientific 
information, the [old PM] standards [were] not of themselves 
sufficient to protect public health." Id. at 38,657.

 Responding to more critical commenters, EPA acknowl-
edged that in several of the cited epidemiological studies, the 
effects of particulate matter were difficult to isolate from 
those of other air pollutants. The Agency soundly rejected, 
however, "the suggestion that such multi-pollutant studies are 
in any way 'negative' with respect to [the] conclusion[ ] that 
PM, alone or in combination with other pollutants, is associat-
ed with adverse effects at levels below those allowed by the 
current standards." Particulate Matter NAAQS, 62 Fed. 
Reg. at 38,661. "This conclusion is based not only on the 
consistency of PM effects across areas with widely varying 
concentrations of potentially confounding copollutants," EPA 
explained, "but also on the extended analyses of the Philadel-
phia studies," in which "PM can reasonably be distinguished 
from potential effects of all pollutants except [sulfur dioxide]." 
Id. Moreover, various characteristics of fine particulate mat-
ter, including its greater ability to "penetrate and remain 
indoors where ... sensitive population[s] reside[ ]," id., and 
to infiltrate "to the airways and gas exchange regions of the 
lung," id. at 38,662, convinced the Agency that even in 

Philadelphia, PM rather than sulfur dioxide "play[ed] an 
important direct role in the observed mortality effects," id.

 Turning to the specific characteristics of the new PM2.5 
NAAQS, EPA gave only a brief explanation of its decision to 
adopt a primary standard with a twenty-four-hour averaging 
period: The standard is "consistent with [most] community 
epidemiological studies," which suggest that same-day and 
previous-day PM concentrations correlate positively with ad-
verse health effects. Particulate Matter NAAQS, 62 Fed. 
Reg. at 38,668. EPA dismissed as insufficiently quantitative 
the few studies suggesting an association between health 
effects and shorter-term (minutes to hours) PM exposures, 
noting that in any case, regulating daily-average PM concen-
trations would also reduce shorter-term-average concentra-
tions in most areas. Addressing the studies reporting 
"stronger associations [between PM and] multiple-
day[-]average concentrations," EPA decided that a twenty-
four-hour-average standard would effectively prevent both 
single-day and multi-day PM "episodes." Id. (emphasis add-
ed).

 EPA then discussed the annual NAAQS' one-year averag-
ing time, explaining that it adopted the standard to reduce 
the likelihood of long-term and cumulative PM exposures, 
which "appear" to pose "larger" risks than shorter-term 
exposures. Id. Although EPA recognized that either a multi-
year or a single-season standard would also be effective 
against long-term exposures, it concluded that the annual 
standard would provide adequate protection against multi-
year PM events and that "the current evidence does not 
provide a satisfactory quantitative basis for setting a national 
fine particle standard in terms of a seasonal averaging time." 
Id. at 38,669.

 Explaining its decision to establish both annual and daily 
standards, EPA indicated that although "either standard 
could be viewed as providing both short-and long-term pro-
tection" from PM2.5, the use of two standards with very 
different averaging times would "serv[e] to address situations 
where the daily peaks and annual averages are not consistent-

ly correlated." Particulate Matter NAAQS, 62 Fed. Reg. at 
38,669. In such situations, the annual standard would "low-
er[ ] both short- and long-term PM2.5 concentrations," while 
the daily standard would "protect[ ] against ... localized 'hot 
spots,' and ... seasonal emissions," neither of which would be 
"well controlled by a national annual standard" alone. Id.

 EPA next made a number of key points about the levels it 
selected for the new NAAQS. Implementing its view that the 
annual standard should do most of the work in mitigating the 
risks of PM2.5, EPA selected the level of the standard "so as 
to protect against the range of effects associated with both 
short-and long-term exposures to PM." Id. at 38,675. In 
those studies reporting statistically significant correlations 
between health effects and PM exposures of any duration, 
the mean annual PM concentrations ranged from 16 to 21 
ug/m3, while in those studies reporting nearly significant 
correlations, the mean annual concentrations ranged from 11 
to 30 ug/m3. Id. at 38,676. "[P]lacing greatest weight on 
those studies that were clearly statistically significant," there-
fore, the Agency adopted an annual standard level of 15 
ug/m3--just "below the range of annual data most strongly 
associated with both short- and long-term exposure effects," 
id., and in the lower half of the 12 to 20 ug/m3 range 
mentioned in the Particulate Matter NPRM, 61 Fed. Reg. at 
65,658-61. Although EPA acknowledged it could not rule out 
"the possibility of [health] effects at lower annual concentra-
tions," it nevertheless decided not only that the evidence for 
such effects is "highly uncertain," but that "the likelihood of 
significant health risk" decreases as annual-average PM con-
centrations approach background levels. Particulate Matter 
NAAQS, 62 Fed. Reg. at 38,676 (emphasis added).

 Having settled on a moderate level for the annual NAAQS, 
EPA selected the level of the daily standard "to provide 
supplemental protection against peak concentrations that 
might occur over limited areas and/or for limited time peri-
ods." Id. This selection process posed difficult questions 
because in all of the available studies in which short-term 
exposures correlated positively with adverse health effects, 
the long-term annual-average PM2.5 concentration exceeded 

the new 15 ug/m3 NAAQS. EPA thus had no way to evaluate 
the "incremental risk associated with single peak exposures to 
PM2.5 in areas where the [new] annual standard is met." Id. 
at 38,677. Because it did not yet know how effective the new 
annual standard would be in reducing the risk of peak short-
term exposures, therefore, EPA decided it could not justify a 
restrictive daily standard, instead selecting 65 ug/m3--a level 
"at the upper end of the range recommended by [Agency] 
staff and most CASAC ... members." Id.

 In justifying the chosen levels for the new NAAQS, EPA 
made one final point relevant to these cases. Responding to 
commenters who advocated lower levels for both the daily 
and annual standards, EPA emphasized that considerable 
uncertainty remains about whether PM2.5 is a threshold 
pollutant--that is, whether there is a concentration below 
which PM2.5 is harmless. See id. at 38,675. As a result, 
EPA could not be sure that lowering the NAAQS would 
produce corresponding reductions in health risks. "[T]he 
inherent scientific uncertainties are too great to support" 
lower levels for the NAAQS, the Agency explained. Id.

 EPA also gave a lengthy explanation for the form of the 
primary standards. Only one aspect of that form is relevant 
here: the Agency's decision to base compliance with the daily 
standard on the average of the 98th percentile of daily PM2.5 
concentrations at each monitoring station. See Particulate 
Matter NAAQS, 62 Fed. Reg. at 38,652. This form permits 
monitoring stations to exceed the 65 ug/m3 level of the 
standard two percent of the time, or about seven days each 
year assuming the stations monitor PM levels every day. 
EPA justified these authorized exceedances on the ground 
that they will increase the "stability" of the standard by 
permitting States to design long-term PM2.5 control pro-
grams without worrying about the effects of "single high 
exposure event[s] that may be due to unusual meteorological 
conditions alone." Id. at 38,673. In addition, EPA pointed 
out that "the [Clean Air] Act provides for emergency State or 
Federal action to address" any such high exposure events. 
Id. That said, EPA rejected alternative daily-standard forms 
(such as a 90th percentile form) that would have allowed more 

exceedances per year, on the ground that a daily standard 
that permitted such "a large number of days with peak PM2.5 
concentrations above the standard level" would not "serve as 
an effective supplement to the annual standard." Id.

 Turning finally to the secondary PM2.5 NAAQS, EPA 
focused primarily on the impact of particulate matter on 
visibility, "an important welfare effect [that] has direct signifi-
cance to people's enjoyment of daily activities in all parts of 
the country." Id. at 38,680. EPA predicted that attainment 
of the new PM2.5 primary standards would improve visibility 
in the eastern United States. Conceding that the new stan-
dards would have little or no effect in the west "except in and 
near certain urban areas," id. at 38,681, EPA observed that 
no single suite of secondary standards would solve visibility 
problems everywhere in the country because, due to regional 
differences in relative humidity, natural background PM lev-
els, and other factors, "a national secondary standard intend-
ed to maintain or improve visibility conditions [in] ... the 
West would have to be set at or even below natural back-
ground levels in the East," while a national secondary stan-
dard intended to "achieve an appropriate degree of visibility 
improvement in the East would permit further degradation in 
the West," id. at 38,680. EPA therefore decided simply to 
establish secondary PM2.5 NAAQS identical to the new pri-
mary NAAQS, and to establish a regional haze program 
under Clean Air Act section 169A, 42 U.S.C. s 7491, to 
improve visibility in those areas where the new national 
standards prove ineffective. Id. at 38,679.

 State and Business Petitioners' Claims

 State and Business Petitioners urge us to vacate the pri-
mary NAAQS because EPA "did not apply any legal stan-
dard, much less the correct standard." State & Bus. Pet'rs' 
Br. at 35. In support of this argument, they cite two 
passages in the final PM2.5 rule. In one, Petitioners claim, 
EPA asserted that it had no obligation to determine a "safe 
level" of PM2.5 prior to adopting a primary NAAQS. Id. at 
36 (internal quotation marks omitted). In the other, EPA 
allegedly acknowledged that "its approach 'might result in 

regulatory programs that go beyond those that are needed to 
effectively reduce risks to public health.' " Id. at 38 (quoting 
Particulate Matter NAAQS, 62 Fed. Reg. at 38,675 (emphasis 
added)). As Petitioners see it, these "concessions" prove that 
EPA failed to set the primary NAAQS at levels " 'requisite'--
that is, not lower or higher than ... necessary--to protect 
the public health with an adequate margin of safety," as 
mandated by Whitman. 531 U.S. at 475-76.

 Petitioners' argument suffers from two significant flaws. 
First, the final PM rule makes neither alleged concession. In 
the first passage, which Petitioners cite as evidence that EPA 
failed to identify a "safe level" of PM2.5, the Agency merely 
disclaimed any obligation to set primary NAAQS by means of 
a two-step process, identifying a "safe level" and then apply-
ing an additional margin of safety. Instead, EPA stated, it 
"may take into account margin of safety considerations 
throughout the process as long as such considerations are 
fully explained and supported by the record." Particulate 
Matter NAAQS, 62 Fed. Reg. at 38,688. Nothing in this 
statement implies that EPA failed to determine "safe levels" 
for fine particulate matter; indeed, the Agency's establish-
ment of new primary NAAQS demonstrates that it did reach 
a conclusion regarding "safe" daily- and annual-average 
PM2.5 levels. State and Business Petitioners obviously dis-
agree with that conclusion, but they have no basis for arguing 
that EPA failed to identify levels of PM2.5 that the Agency 
considers safe.

 Viewed in its proper context, EPA's other alleged "conces-
sion"--that the new NAAQS "go beyond" what is necessary 
to protect public health--proves equally chimerical. In the 
final PM2.5 rule, EPA said only that "a number of ... 
commenters [to the proposed NAAQS] strongly supported 
standard levels more stringent than those proposed by" the 
Agency, but that "setting such [lower] standards ... might 
result in regulatory programs that go beyond those that are 
needed to effectively reduce risks to public health." Id. at 
38,675 (emphasis added). This passage in no way supports 
Petitioners' argument that EPA failed to set the primary 
PM2.5 NAAQS at levels " 'requisite' ... to protect the public 

health with an adequate margin of safety." Whitman, 531 
U.S. at 475-76. Instead, the passage documents EPA's rejec-
tion of lower standards, demonstrating that the Agency not 
only recognized, but acted upon, its statutory obligation to set 
the primary NAAQS at levels no lower than necessary to 
reduce public health risks.

 Petitioners' argument that EPA neither identified nor ap-
plied the proper legal standard also exaggerates the Agency's 
obligation to quantify its decisionmaking. The argument 
relies on two statements from the rulemaking and one from 
ATA I: EPA's assertion that it need not "determine a 'safe 
level' " of PM2.5 before calculating a margin of safety, State 
& Bus. Pet'rs' Br. at 36 (quoting Particulate Matter NAAQS, 
62 Fed. Reg. at 38,688 (internal quotation marks omitted)); 
the Agency's "disavow[al]" of certain "specific risk estimates," 
id. at 37 (citing Particulate Matter NAAQS, 62 Fed. Reg. at 
38,656); and finally, the Agency's claim that "there is no 
threshold 'amount of scientific information or degree of cer-
tainty' required to promulgate or revise a NAAQS," id. 
(quoting Resp't's 1998 Br. at 49). According to Petitioners, 
these three assertions prove that EPA failed to "describe[ ] 
the standard under which [it] ... arrived at [its] conclusion" 
regarding the appropriate level for the NAAQS, as required 
by our decision in American Lung Ass'n v. EPA, 134 F.3d 
388, 392-93 (D.C. Cir. 1998). Petitioners misread American 
Lung Ass'n, however, if they think it requires EPA, prior to 
setting primary NAAQS, to identify perfectly safe levels of 
pollutants, to rely on specific risk estimates, or to specify 
threshold amounts of scientific information.

 Although we recognize that the Clean Air Act and circuit 
precedent require EPA qualitatively to describe the standard 
governing its selection of particular NAAQS, we have ex-
pressly rejected the notion that the Agency must "establish a 
measure of the risk to safety it considers adequate to protect 
public health every time it establishes a [NAAQS]." Natural 
Res. Def. Council, Inc. v. EPA, 902 F.2d 962, 973 (D.C. Cir. 
1990), vacated in part, 921 F.2d 326 (D.C. Cir. 1991) (vacating 
a later part of the court's decision). Such a rule would 
compel EPA to leave hazardous pollutants unregulated unless 

and until it completely understands every risk they pose, thus 
thwarting the Clean Air Act's requirement that the Agency 
err on the side of caution by setting primary NAAQS that 
"allow[ ] an adequate margin of safety[.]" 42 U.S.C. 
s 7409(b)(1). The Act requires EPA to promulgate protec-
tive primary NAAQS even where, as here, the pollutant's 
risks cannot be quantified or "precisely identified as to nature 
or degree," Particulate Matter NAAQS, 62 Fed. Reg. at 
38,653; see also Ozone NAAQS, 62 Fed. Reg. at 38,857 
(explaining that section 109(b)(1)'s "margin of safety require-
ment was intended to address uncertainties associated with 
inconclusive scientific and technical information ... as well as 
to provide a reasonable degree of protection against hazards 
that research has not yet identified"). For its part, Ameri-
can Lung Ass'n requires only that EPA "engage in reasoned 
decision-making," 134 F.3d at 392, not that it definitively 
identify pollutant levels below which risks to public health are 
negligible.

 Thus, EPA's inability to guarantee the accuracy or increase 
the precision of the PM2.5 NAAQS in no way undermines the 
standards' validity. Rather, these limitations indicate only 
that significant scientific uncertainty remains about the health 
effects of fine particulate matter at low atmospheric concen-
trations. As the exhaustive rulemaking process makes clear, 
see supra pp. 15-21, EPA set the primary NAAQS notwith-
standing that uncertainty, just as the Act requires.

 We are equally unpersuaded by State and Business Peti-
tioners' argument that EPA should have considered whether 
reducing atmospheric concentrations of fine particles would 
increase levels of " 'ozone or ... a different fine particle 
component,' potentially increasing [overall] health risk[s]." 
State & Bus. Pet'rs' Br. at 37 (quoting Advance NPRM, 61 
Fed. Reg. at 65,768). Petitioners apparently believe EPA 
may not regulate one pollutant without determining how that 
regulation would affect the levels of all other pollutants with 
which the first could react. Given the complexity of atmo-
spheric chemistry, see Advance NPRM, 61 Fed. Reg. at 
65,768 (noting "multiple nonlinearities and positive and nega-
tive feedbacks"), however, imposing such a requirement 

would hamstring the Agency, preventing it from complying 
with the Clean Air Act's mandate to set protective primary 
NAAQS. We might feel differently about EPA's obligations 
in this regard had Petitioners pointed to clear evidence that 
lowering atmospheric PM2.5 levels will necessarily increase 
levels of other pollutants. Petitioners cite no such evidence, 
however, instead relying on an obscure passage from the 
Advance NPRM in which EPA said only that the complicated 
interactions among different atmospheric pollutants, including 
PM, make "integrated implementation" of pollution controls 
"far from a straightforward exercise." Id. As EPA ob-
serves, this "general discussion of the interrelationship[s]" 
among pollutants hardly constitutes a finding that regulating 
PM2.5 levels will increase health risks from ozone and other 
pollutants. Resp't's Particulate Matter Br. at 31-32 n.23.

 State and Business Petitioners' remaining substantive 
claims merit little discussion. They argue that EPA "failed 
to determine whether attainment of the [old particulate mat-
ter] standard would leave unacceptable public health risk." 
State & Bus. Pet'rs' Br. at 40. As EPA notes, however, the 
final PM rule explicitly states:

 [T]he extensive PM epidemiological data base provides 
 evidence of serious health effects (e.g., mortality, exacer-
 bation of chronic disease, increased hospital admissions) 
 in sensitive populations (e.g., the elderly, individuals with 
 cardiopulmonary disease), as well as significant adverse 
 health effects (e.g., increased respiratory symptoms, 
 school absences, and lung function decrements) in chil-
 dren. Moreover, these effects associations are observed 
 in areas or at times when the levels of the [old PM] 
 standards are met.
 
Particulate Matter NAAQS, 62 Fed. Reg. at 38,657 (emphasis 
added). Most CASAC members, moreover, recognized the 
need to strengthen "the health protection[s] provided by the 
[old] PM standards." Particulate Matter NAAQS, 62 Fed. 
Reg. at 38,666. Finally, in ATA I, we found "ample support 
for EPA's decision to regulate coarse particulate pollution 
above the 1987 levels," particularly given the lenient standard 
of review. 175 F.3d at 1054. Though we referred only to 

coarse particulate matter, the statement nevertheless indi-
cates our belief--which Petitioners give us no reason to 
reconsider--that the Agency substantiated its judgment re-
garding the inadequacy of the old particulate matter stan-
dards.

 ATA I also forecloses Petitioners' "confounder" argu-
ment--that factors "such as the presence of other pollutants 
in the ambient air, temperature, humidity, and indoor air 
pollution might account for some or all of the associations 
reported in the studies on which EPA relied." State & Bus. 
Pet'rs' Br. at 46-47. "[T]he growing empirical evidence 
demonstrating a relationship between fine particle pollution 
and adverse health effects," we said in ATA I, "amply justi-
fies establishment of new fine particle standards." 175 F.3d 
at 1056. We could not have reached that conclusion had we 
agreed with the Non-State Petitioners in ATA I that "EPA's 
... [s]tudies failed adequately to address the confounding 
effect of other pollutants." Non-State Pet'rs' 1998 Br. at 28. 
Even if we did not think ourselves bound by ATA I, though, 
we would defer to EPA's entirely plausible reasoning regard-
ing the confounder issue: According to the Agency, the 
"consistency of PM effects across areas with widely varying 
concentrations of potentially confounding copollutants," to-
gether with Agency staff's "extended analyses of the Philadel-
phia studies," amply justify the conclusion that "PM, alone or 
in combination with other pollutants, is associated with ad-
verse effects at levels below those allowed by the current 
standards." Particulate Matter NAAQS, 62 Fed. Reg. at 
38,661.

 Next, Petitioners argue that the PM2.5 NAAQS are arbi-
trary and capricious because "EPA conceded that public 
health risks would decline with more stringent standards only 
if" the Agency correctly assumed "that (1) there is 'a contin-
uum of health risks down to the lower end of the ranges of air 
quality' at issue, and (2) 'the reported associations are, in fact, 
causally related to PM2.5 at the lowest concentrations mea-
sured.' " State & Bus. Pet'rs' Br. at 45 (quoting Particulate 
Matter NAAQS, 62 Fed. Reg. at 38,675). EPA made this 
alleged concession, however, only in the context of rejecting 
standards "more stringent than those proposed" in the 

NPRM, Particulate Matter NAAQS, 62 Fed. Reg. at 38,675; 
the Agency never "conceded" that the actual NAAQS rely on 
questionable assumptions or associations.

 Petitioners mount several specific challenges to the daily 
and annual NAAQS. To begin with, they contend that EPA 
failed to justify the daily PM2.5 standard, but because this 
argument appears nowhere in their ATA I briefs, see Non-
State Pet'rs' 1998 Reply Br. at 1 ("We focus on the lack of 
justification for setting the annual standard at 15 ug/m3."); 
see also id. at 1 n.3 ("Of the two new primary standards, the 
annual standard imposes the more stringent 'controlling' re-
quirement."), we decline to consider it. See Order of the 
United States Court of Appeals for the District of Columbia 
Circuit at 1 (May 29, 2001) (No. 97-1440) ("The [post-remand] 
briefs shall address only 'preserved challenges' not hitherto 
resolved by the Supreme Court or by this court[.]" (quoting 
Whitman, 531 U.S. at 476)). Challenging the annual NAAQS, 
Petitioners argue the record does not support setting the 
standard at 15 ug/m3. Contrary to Petitioners' assertion, 
however, EPA staff never recommended a higher, 20 ug/m3 
level. Rather, staff recommended that EPA consider a range 
of levels from 12.5 to 20 ug/m3, making no specific recommen-
dation within this range. Office of Air Quality Planning & 
Standards, U.S. Envtl. Prot. Agency, EPA-452lE0R-96-013, 
Review of the National Ambient Air Quality Standards for 
Particulate Matter: Policy Assessment of Scientific and 
Technical Information VII-36 to VII-37 (1996). Moreover, 
EPA ultimately set the standard just below the range of 
mean annual PM2.5 concentrations observed in studies show-
ing a statistically significant association between fine particu-
late matter and health effects. See supra p. 19. While we 
cannot say those studies necessitated a standard level of 15 
ug/m3, neither have we any basis for concluding that EPA's 
decision was unreasonable or unsupported by the record. We 
repeat: "That the evidence in the record may also support 
other conclusions, even those that are inconsistent with the 
Administrator's, does not prevent us from concluding that 
[her] decisions were rational and supported by the record." 
Lead Indus. Ass'n, 647 F.2d at 1160 (internal citations omit-
ted).

 This brings us finally to Petitioners' argument that EPA 
"denied the public essential procedural rights" by failing to 
obtain and make public the data underlying certain "key 
studies" relating to the "confounder" issue. Claiming neither 
that they were unable to obtain the studies, nor that the 
studies were improperly published or peer reviewed, Petition-
ers instead urge us to impose a general requirement that 
EPA obtain and publicize the data underlying published 
studies on which the Agency relies. The Clean Air Act 
imposes no such obligation; it merely directs EPA to include 
in any notice of proposed rulemaking "data, information, and 
documents ... on which the proposed rule relies." 42 U.S.C. 
s 7607(d)(3) (emphasis added). Here, EPA explained that it 
"relied on the scientific studies cited in the rulemaking rec-
ord, rather than on the raw data underlying" those studies. 
Particulate Matter NAAQS, 62 Fed. Reg. at 38,689. In 
addition, Agency counsel advised us at oral argument that on 
those few occasions when EPA requested underlying data 
from an investigator, the Agency included those data in the 
record, Tr. of Oral Arg. at 74-75. More generally, we agree 
with EPA that requiring agencies to obtain and publicize the 
data underlying all studies on which they rely "would be 
impractical and unnecessary." Particulate Matter NAAQS, 
62 Fed. Reg. at 38,689. As EPA persuasively stated in 
denying Petitioners' original request for the information:

 If EPA and other governmental agencies could not rely 
 on published studies without conducting an independent 
 analysis of the enormous volume of raw data underlying 
 them, then much plainly relevant scientific information 
 would become unavailable to EPA for use in setting 
 standards to protect public health and the environ-
 ment.... [S]uch data are often the property of scienti-
 fic investigators and are often not readily available be-
 cause of ... proprietary interests ... or because of 
 [confidentiality] arrangements [with study participants].
 
Id.

 State and Business Petitioners' challenge to the secondary 
NAAQS hinges on the proposition that the identical primary 

NAAQS are arbitrary and capricious. Having just rejected 
the latter argument, we need not consider the former.

 Environmental Petitioners' Claims

 Environmental Petitioners' central argument regarding the 
primary NAAQS is straightforward: EPA should have set a 
stricter daily PM2.5 NAAQS rather than relying almost ex-
clusively on the stringent annual standard. Petitioners con-
tend that because "adverse health effects [of] ... PM2.5 
occur after single-day exposures[,] ... the NAAQS must 
prevent most, if not all, such daily exposures in order to" 
reduce health risks. Envtl. Pet'rs' Br. at 10. A strategy that 
focuses on the annual rather than the daily standard, Peti-
tioners argue, will do little to prevent short-term pollution 
"events," in which PM2.5 concentrations exceed healthy levels 
for days or weeks. Questioning the level of the daily 
NAAQS, Petitioners note that EPA evaluated three possible 
levels (65, 50, and 25 ug/m3), ultimately choosing the highest 
even though the risk assessment study indicates that in some 
cities, a lower daily standard would greatly reduce the risks 
of both short- and long-term exposures. Risk Assessment at 
113-18. Finally, with respect to the form of the daily stan-
dard, Petitioners argue that focusing on the 98th percentile 
value allows about seven days per year (two percent of 365 
days) to escape regulation. The 15 ug/m3 annual standard, 
Petitioners observe, will do almost nothing to limit PM2.5 
levels on these seven otherwise unregulated days.

 Responding to these arguments, EPA observes that there 
are "significant uncertainties in identifying the extent of the 
incremental risk associated with single peak exposures to 
PM2.5 in areas where the annual standard is met." Particu-
late Matter NAAQS, 62 Fed. Reg. at 38,677. As we under-
stand the problem, existing data are insufficient to permit 
EPA to separate health effects of long-term-average PM2.5 
concentrations from those of short-term peak concentrations 
because in all cities in which the Agency found a positive 
correlation between short-term exposures and adverse health 
effects, the long-term-average PM2.5 concentrations exceeded 

the new annual NAAQS. Thus, EPA cannot determine "what 
risks might have been associated with [short-term] peak 
[PM2.5] levels had the long-term averages in these areas 
been below that selected for the [new] annual standard." Id. 
This uncertainty, together with evidence suggesting that "the 
... risk over the course of a year associated solely with a 
limited number of peak exposures is ... considerably smaller 
than that associated with the entire air quality distribution," 
id. at 38,677, convinced EPA to focus its attention on the 
annual NAAQS. We think this expert judgment worthy of 
deference, at least until formerly polluted areas come into 
compliance with the new annual PM2.5 standard and new 
health effects data from those areas become available.

 Moreover, EPA provides a convincing justification for its 
decision to place little faith in the quantitative results of the 
risk assessment, which Petitioners cite for the proposition 
that setting a restrictive daily standard would provide bene-
fits beyond those of the annual standard. Although Petition-
ers' position finds some support in the numerical results of 
the risk assessment, see Risk Assessment at 113-18 (detailing 
the results of the study, which suggest that lowering the daily 
standard would reduce health effects even if the annual 
standard were held steady), EPA contends that uncertainties 
in the assumptions underlying that study render the quantita-
tive predictions insufficiently "reliable to serve as the basis 
for establishing any more stringent standards than were 
warranted based directly on EPA's analysis of the epidemio-
logical evidence." Resp't's Particulate Matter Br. at 51; see 
also Particulate Matter NAAQS, 62 Fed. Reg. at 38,656 
("EPA emphasizes that it places greater weight on the overall 
conclusions derived from the studies ... than on the specific 
concentration-response functions and quantitative risk esti-
mates derived from them."). Specifically, in the relevant 
portions of the risk assessment, Agency staff apparently used 
a model that assumed imposition of a new daily standard 
would prompt States to restrict PM-generating activities on 
all days, not just days that would otherwise exceed the 
standard. Consequently, stricter daily standards in the mod-
el drove down both short-term and annual-average PM2.5 

concentrations. "In other words," EPA explains, "even 
though the annual standard was held constant[,] ... the 
model drove all daily values, including those at or below the 
annual mean, to levels lower than those calculated from 
compliance with the annual standard alone," and it was this 
drop in annual PM2.5 levels, not the drop in daily levels, that 
produced the projected health benefits. Resp't's Particulate 
Matter Br. at 53. Not only do we owe deference to an 
agency's determination regarding the reliability of scientific 
evidence, but Petitioners give us no reason to question EPA's 
judgment regarding the reliability of the risk assessment. 
See Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C. Cir. 1997) 
("As we have said, we review scientific judgments of [an] 
agency 'not as the chemist, biologist, or statistician that we 
are qualified neither by training nor experience to be, but as 
a reviewing court exercising our narrowly defined duty of 
holding agencies to certain minimal standards of rationality.' " 
(quoting Ethyl Corp. v. EPA, 541 F.2d 1, 36 (D.C.Cir. 1976))).

 We recognize that EPA's reasoning leaves two unanswered 
questions, but neither proves fatal. First, one might argue 
from EPA's discussion of the risk assessment results that the 
Agency should have adopted a lower annual NAAQS. On 
this point, EPA persuasively explains that it discounted the 
quantitative predictions of the risk assessment in light of 
"inherent scientific uncertainties," including the "possibility of 
... thresholds" below which PM2.5 has little or no effect. 
Particulate Matter NAAQS, 62 Fed. Reg. at 38,675. In other 
words, although the model predicted that dropping annual-
average PM2.5 levels below 15 ug/m3 would reduce adverse 
health effects, those predictions relied on untested--and 
hence unreliable--assumptions about the incidence of health 
effects at low particulate matter levels.

 Second, EPA's skepticism about the quantitative results of 
the risk assessment, together with the Agency's repeated 
assertions that the evidence does not justify a strict daily 
NAAQS, lead one to wonder why a daily standard is even 
necessary. EPA's position on this issue seems incongruous, 

emphasizing on the one hand the need for a daily standard to 
"provid[e] supplemental protection against peak exposures 
not addressed by the annual standard," Particulate Matter 
NAAQS, 62 Fed. Reg. at 38,677, and on the other the lack of 
evidence establishing that "peak exposures not addressed by 
the annual standard" pose "incremental" risks over and above 
those associated with high annual-average PM2.5 levels, id. 
None of the parties, however, challenges the daily NAAQS in 
precisely these terms: State and Business Petitioners focus 
on the annual NAAQS, while Environmental Petitioners pri-
marily cite the evidence supporting a stricter daily NAAQS. 
Even if the parties had raised this issue, however, we would 
neither vacate nor remand the daily NAAQS. Reviewing the 
record ourselves, we find support for the following explana-
tion of the existence and form of the daily standard: (1) Some 
daily NAAQS is necessary to prevent deadly, short-term 
PM2.5 episodes of the sort that occurred during the famous 
1952 London Fog, id. at 38,659; but (2) in areas that meet the 
new 15 ug/m3 annual standard, such events, though "theoreti-
cally possible," are "unlikely," id. at 38,673; so (3) each year, 
States should be permitted to address one or a few such 
events through statutorily-authorized "emergency episode 
plans" rather than longer-term pollution control measures, id. 
at 38,673 & n.35; (4) otherwise States would have to design 
their pollution control programs around "single high exposure 
events that may be due to unusual meteorological conditions 
alone," rendering the programs less "stable"--and hence, we 
assume, less effective--than programs designed to address 
longer-term average conditions, id. at 38,673. We cannot 
fault this strategy. As Justice Breyer noted in his Whitman 
concurrence, because "[a] rule likely to cause more harm to 
health than it prevents is not a rule that is 'requisite to 
protect the public health,' " the Clean Air Act must permit 
EPA to "consider whether a proposed rule promotes safety 
overall." 531 U.S. at 495 (Breyer, J., concurring) (emphasis 
added). Therefore, to promote development of more "effec-
tive [pollution] control programs," EPA was entirely justified 
in permitting a few days to escape regulation under the daily 

NAAQS. Particulate Matter NAAQS, 62 Fed. Reg. at 38,673. 
Having no basis to question EPA's choice of seven (rather 
than, for example, four or ten) unregulated days, our deferen-
tial standard of review requires that we leave the daily 
NAAQS in place.

 Finally, unlike State and Business Petitioners, Environ-
mental Petitioners mount an independent challenge to the 
secondary standards, contending that EPA expressly recog-
nized the standards were inadequate to improve visibility in 
much of the western United States. See supra p. 21 (citing 
Particulate Matter NAAQS, 62 Fed. Reg. at 38,680-81). In 
ATA I, however, we concluded that "Congress did not intend 
the secondary NAAQS to eliminate all adverse visibility ef-
fects and, therefore, that the EPA acted within the scope of 
its authority in deciding to rely upon the regional haze 
program to mitigate some of the adverse visibility effects 
caused by" PM2.5. 175 F.3d at 1056-57. Moreover, EPA 
provides a plausible explanation for its decision not to set 
lower secondary NAAQS: National standards adequate to 
improve visibility in the west "would have to be set at or even 
below natural background levels in the East." Particulate 
Matter NAAQS, 62 Fed. Reg. at 38,680. Petitioners give us 
no reason to question this explanation.

 IV.

 Turning to the ozone standards, we again begin with a 
summary of the rulemaking process, and then consider Peti-
tioners' challenges.

 The Rulemaking

 EPA first announced its plan to revise the ozone NAAQS in 
late 1996, issuing a public notice of proposed rulemaking. 
Ozone NAAQS, 62 Fed. Reg. at 38,858 (discussing NAAQS 
for Ozone: Proposed Decision, 61 Fed. Reg. 65,716 (proposed 
Dec. 13, 1996)). In that notice, EPA indicated that it intend-
ed to replace the existing, one-hour-average, primary ozone 

standard of 0.12 ppm with a new, eight-hour-average stan-
dard. It sought comments on this change and also on three 
possible levels for the new standard--0.09, 0.08, and 0.07 
ppm. According to EPA, a level of 0.09 ppm would afford 
about the same protection as the old, one-hour-average stan-
dard, id. at 38,858; 0.08 would replicate the lowest exposure 
level actually tested in clinical studies, id. at 38,861; and 0.07 
would be "highly precautionary in nature," id. at 38,858.

 As in connection with the particulate matter NAAQS, EPA 
took account of CASAC's recommendations, Agency staff's 
assessment of the available information regarding human 
exposure and risk, and tens of thousands of comments sub-
mitted in response to the NPRM. Id. at 38,858-59. EPA 
also conducted risk assessments in nine representative urban 
areas (the "nine area study") to estimate the correlation 
between ozone exposure and health risks for the general 
population and for two groups at higher risk, "outdoor work-
ers" and a group EPA calls "outdoor children." Id. at 38,860 
(internal quotation marks omitted). Moreover, EPA devel-
oped quantitative risk estimates for those specific health 
effects for which sufficient concentration-response data were 
available. Id. Finally, in deciding when certain observed 
physiological effects of ozone "become so significant that they 
should be regarded as adverse" to individuals' health, EPA 
looked to guidelines published by the American Thoracic 
Society. Id.

 In the end, EPA adopted an eight-hour-average, 0.08 ppm 
standard. Ozone NAAQS, 62 Fed. Reg. at 38,856. Two 
aspects of this new standard require discussion here: averag-
ing time and level.

 Explaining its switch from a one- to an eight-hour averag-
ing time, EPA first noted that the one-hour-average standard 
reflected the belief--since refuted--that the most serious 
health effects of ozone result from short-term (one- to three-
hour) exposures. According to EPA, however, new studies 
clearly "demonstrate[ ] associations between a wide range of 
health effects and prolonged (... [six]- to [eight]-hour) expo-

sures" to concentrations less than that of the old standard. 
Id. at 38,861. Citing the nine area study, EPA indicated that 
an averaging time of eight hours not only reduces risk 
associated with short-term exposures, id. at 38,862 & n.11, 
but also limits cumulative exposure, id. at 38,861. The longer 
averaging time, moreover, reduces variability in ozone levels 
across geographic areas. Id. at 38,862. EPA also empha-
sized that CASAC unanimously agreed with the proposed 
change. Id. at 38,861; see also U.S. Envtl. Prot. Agency, 
EPA-SAB-CASAC-LTR-96-002, Letter Re: CASAC Clo-
sure on the Primary Standard Portion of the Staff Paper for 
Ozone 2 (1995) ("CASAC Ozone Letter") ("The Panel was in 
unanimous agreement that the present [one]-hour standard 
be eliminated and replaced with an [eight]-hour standard."). 
Acknowledging some individual CASAC members' comments 
to the effect that "choosing between a [one]- or [eight]-hour 
averaging time is a 'policy' choice" not dictated by science, 
EPA declined to view "these individual statements during the 
course of CASAC's review" as in any way "contradict[ing] 
[ ]or supersed[ing] the clear and unanimous agreement" on 
the issue "conveyed ... in [CASAC's] closure letter." Ozone 
NAAQS, 62 Fed. Reg. at 38,862. In EPA's opinion, "the fact 
that an averaging time of [eight] hours results in a signifi-
cantly more uniformly protective national standard than the 
current [one]-hour standard is an important public health 
policy consideration that supports the selection" of the former 
averaging time. Id. at 38,862.

 Turning to the 0.08 ppm level of the primary standard, 
EPA first explained that because ozone is--or is thought to 
be--a non-threshold pollutant, "it is not possible to select a 
level below which absolutely no [health] effects are likely to 
occur." Id. at 38,863. Nevertheless, EPA undertook to 
select a standard level that would "reduce risk sufficiently to 
protect public health with an adequate margin of safety." Id. 
In deciding among the proposed levels (0.09, 0.08, and 0.07 
ppm), EPA took into account a number of "key observations 
and conclusions," id., including:

. CASAC's conclusion that the old standard "provided little, 
 if any, margin of safety," id. (internal quotation marks and 
 citations omitted);

. Numerous epidemiological studies attributing "excess hos-
 pital admissions" to ozone exposure at concentrations 
 below that of the old standard, id. at 38,864;

. Evidence that an eight-hour-average, 0.09 ppm standard 
 would constitute only a modest improvement over the old 
 standard, id.;

. "[C]lear evidence from human clinical studies" that pro-
 longed exposure to 0.08 ppm of ozone, at moderate exer-
 tion, correlates positively with health effects like coughing, 
 pain with inhalation, and reduced lung function, id. at 
 38,863-64;

. Clinical studies suggesting that "[w]hile group mean re-
 sponses ... at ... 0.08 ppm"--the "lowest exposure level 
 tested"--are usually "small or mild in nature, responses of 
 some sensitive individuals are sufficiently severe ... to be 
 considered adverse," id.;

. Indications from the nine area study that "statistically 
 significant reductions in exposure and risk ... result from 
 alternative [eight]-hour standards as the level [is lowered] 
 from 0.09 ppm to ... 0.07 ppm," but that "there is no ... 
 bright line that differentiates between acceptable and 
 unacceptable risks within this range," id. at 38,864; and 
 finally,

. Evidence from the same study that "a standard set at 0.09 
 ppm would allow approximately 40 percent to 65 percent 
 more outdoor children to experience [decreases in lung 
 function and pain with inhalation] than would a 0.08 ppm 
 standard," id. at 38,868.

Despite some "inherent uncertainties," EPA viewed these 
observations and conclusions, taken together, as indicating 
that the "public health impacts" of ozone at levels lower than 
the one-hour, 0.12 ppm standard are "important and suffi-

ciently large as to warrant a standard set at a level of 0.08 
ppm." Id.

 Acknowledging that numerous public comments advocated 
a level of 0.07 ppm, EPA offered several explanations for its 
decision to reject a more stringent standard. Most impor-
tant, EPA pointed out that not one CASAC panel member 
"supported a standard set lower than 0.08 ppm, specifically 
after considering a range of alternative standards that includ-
ed 0.07 ppm." Ozone NAAQS, 62 Fed. Reg. at 38,868. In 
addition, EPA contended that the "most certain" adverse 
health effects of ozone "are transient and reversible" at low 
ozone levels, while "the more serious ... impacts on health 
are less certain," id.--presumably in part because no human 
clinical studies have evaluated concentrations lower than 0.08 
ppm. Finally, EPA noted that a 0.07 ppm standard "would 
be closer to peak background levels that infrequently occur in 
some areas due to nonanthropogenic sources of [ozone] pre-
cursors." Id.

 One final aspect of EPA's discussion of the primary 
NAAQS level is relevant here: The Agency's response to 
certain comments questioning its reliance on specific field, 
epidemiological, and clinical studies. According to EPA, the 
comments "did not reflect an integrative assessment of the 
evidence--the approach CASAC has historically urged [the 
Agency] to follow--but rather a piecemeal look at each indi-
vidual study." Id. at 38,866. EPA therefore dismissed the 
comments, arguing that such an incremental critique "tends 
to miss the strength of the entire body of evidence taken 
together." Id.

 In setting the secondary NAAQS, EPA "focused on [ozone] 
effects on vegetation[,] since these public welfare effects are 
of most concern at [ozone] concentrations typically occurring 
in the United States." Ozone NAAQS, 62 Fed. Reg. at 
38,874-75. The NPRM identified two possible changes to the 
secondary standard: replacing the old, one-hour-average 0.12 
ppm standard with an eight-hour-average standard identical 
to the new primary standard, or adopting an entirely new 
"seasonal standard" that would regulate the cumulative sum 

of hourly ozone concentrations during the three consecutive 
months of the year with highest ozone levels. Id. at 38,858. 
In deciding between these options, EPA again took account of 
public comments, CASAC's recommendations, and Agency 
staff's assessment of the available information. Id. at 38,874. 
Citing statements by CASAC panel members, id. at 38,875, 
EPA first concluded that "a secondary NAAQS more strin-
gent than the [old, 0.12 ppm] primary standard, was neces-
sary to protect vegetation from [ozone]," id. at 38,877 (inter-
nal quotation marks and citations omitted). "[I]nadequate 
rural and remote [ozone] air quality data," however, limited 
EPA's ability to evaluate the potential benefits of a seasonal 
standard. Id. ("[G]iven the present limits of the scientific 
evidence ..., the Administrator has decided that it is not 
appropriate to move forward with a seasonal secondary stan-
dard at this time."). Ultimately, therefore, EPA rejected the 
seasonal standard (at least until better data become avail-
able), choosing instead to set the secondary standard equal to 
the primary standard. Id. at 38,877-78.

 Ozone Petitioners' Claims

 American Trucking Associations and the other Ozone Peti-
tioners challenge the NAAQS along several lines. To begin 
with, just as State and Business Petitioners argued with 
respect to the NAAQS for particulate matter, Ozone Petition-
ers contend that EPA neither identified nor applied "any 
legal standard" in setting the ozone NAAQS. Ozone Pet'rs' 
Br. at 38. Petitioners cite EPA's statements that it need not 
identify a "safe level" of ozone, and that "margin of safety 
determinations ... may not be amenable to quantification in 
terms of what risk is 'acceptable' or any other metric," Ozone 
NAAQS, 62 Fed. Reg. at 38,883, as evidence that EPA failed 
to set the primary ozone NAAQS "at the level that is 'requi-
site' ... to protect the public health with an adequate margin 
of safety," Whitman, 531 U.S. at 475-76. As we discussed 
earlier, however, EPA has no obligation either to identify an 
accurate "safe level" of a pollutant or to quantify precisely the 
pollutant's risks prior to setting primary NAAQS. See supra 
pp. 23-24. Rather, EPA must err on the side of caution, just 

as it did here--setting the NAAQS at whatever level it deems 
necessary and sufficient to protect the public health with an 
adequate margin of safety, taking into account both the 
available evidence and the inevitable scientific uncertainties.

 Petitioners raise two specific arguments regarding the 
primary ozone NAAQS. First, they assert that EPA "failed 
to determine whether attainment of the [old, one-hour-
average, primary ozone] standard would leave unacceptable 
public health risk," Ozone Pet'rs' Br. at 43, and relatedly, that 
"none of the alternative [eight]-hour standards [considered by 
EPA] is significantly more protective of the public health than 
the [old] [one]-hour NAAQS," id. at 47-48. We disagree. As 
noted earlier, not only is the record replete with references to 
studies demonstrating the inadequacies of the old one-hour 
standard, see supra p. 39, but EPA discussed at length the 
advantages of a longer averaging time, including reduced risk 
of prolonged exposures to unhealthy ozone levels and in-
creased uniformity of protection across different urban areas, 
see Ozone NAAQS, 62 Fed. Reg. at 38,861. Moreover, EPA 
specifically cited CASAC's "consensus ... that an [eight]-
hour standard [is] more appropriate for a human health-based 
standard than a [one]-hour standard" and its recommendation 
that "the present ... standard be eliminated and replaced 
with an [eight]-hour standard." CASAC Ozone Letter at 2; 
see also Ozone NAAQS, 62 Fed. Reg. at 38,861 ("In proposing 
to change the averaging time of the primary standard from 
[one] to [eight] hours, the Administrator was concurring with 
the unanimous recommendation of CASAC."). Given this 
record evidence, our deferential standard of review, and the 
Clean Air Act's requirement that EPA must either follow 
CASAC's advice or explain why the proposed rule "differs ... 
from ... [CASAC's] recommendations," 42 U.S.C. 
s 7607(d)(3), Petitioners cannot seriously expect us to second-
guess EPA's conclusion regarding the inadequacy of the old, 
one-hour-average standard.

 Though somewhat more persuasive, Petitioners' second 
specific challenge also falls short. They argue that in select-
ing a level of 0.08 ppm rather than 0.09 or 0.07, EPA reached 
"inconsistent conclusions regarding specific health risks," 

thus "demonstrat[ing] that [the Agency's] decision to revise 
the NAAQS lacks a rational basis and therefore is arbitrary 
and capricious." Ozone Pet'rs' Br. at 48. In support of this 
point, Petitioners challenge EPA's three justifications for 
selecting 0.08 rather than 0.07: that no CASAC member 
supported a standard below 0.08; that health effects at ozone 
levels below 0.08 are transient and reversible; and that 0.07 
would be too close to peak background levels. See supra p. 
37 (noting these arguments). As to the first point, Petition-
ers observe that "most members of the CASAC panel who 
expressed an opinion on standard level supported a level 
above ... 0.08 ppm," and that "CASAC ultimately concluded 
that there is 'no bright line' distinguishing any of the alterna-
tive standards ... as significantly more protective of public 
health." Ozone Pet'rs' Br. at 49-50 (quoting CASAC Ozone 
Letter at 3). In addition, Petitioners point out, ATA I 
expressly discredits the contention that ozone health effects 
are more transient and reversible at concentrations below 
0.08 ppm than at concentrations between 0.08 and 0.09. 175 
F.3d at 1035 ("[The record evidence] does not make the 
categorical distinction the dissent says it does, and it is far 
from apparent that any health effects existing above [0.08 
ppm] are permanent or irreversible."). Petitioners finally 
note that proximity to peak background levels is an indeter-
minate standard that points to no particular level for the 
primary NAAQS.

 Although we think Petitioners' individual criticisms have 
some force, we are satisfied that in selecting a level of 0.08 
rather than 0.07 (or, for that matter, 0.09), EPA "engage[d] in 
reasoned decision-making." American Lung Ass'n, 134 F.3d 
at 392. For one thing, CASAC's inability to reach consensus 
is hardly dispositive; EPA is entitled to give "significant 
weight" to the fact that no committee member advocated a 
level of 0.07 ppm, Ozone NAAQS, 62 Fed. Reg. at 38,868, 
particularly as eight of the ten panel members who expressed 
opinions advocated a level of 0.08 ppm or greater, while the 
remaining two simply "endorsed the [0.07-0.09 ppm] range 
presented by the Agency ... and stated that the [final] 
selection should be a policy decision," CASAC Ozone Letter 

at 3. Also, although relative proximity to peak background 
ozone concentrations did not, in itself, necessitate a level of 
0.08, EPA could consider that factor when choosing among 
the three alternative levels. Most convincing, though, is the 
absence of any human clinical studies at ozone concentrations 
below 0.08. See id. at 38,863. This lack of data amply 
supports EPA's assertion that the most serious health effects 
of ozone are "less certain" at low concentrations, id. at 38,868, 
providing an eminently rational reason to set the primary 
standard at a somewhat higher level, at least until additional 
studies become available. Cf. Natural Res. Def. Council, 
Inc., 902 F.2d at 974 (declining to require EPA "to explain 
the risk it considered tolerable" in setting the challenged 
NAAQS "because of the uncertainty of the data upon which 
the Administrator needed to rest his assessment"). Overall, 
therefore, we disagree with Petitioners that in selecting 0.08 
ppm rather than a lower or higher level, EPA reached 
"inconsistent conclusions." The Agency could reasonably 
conclude that existing data support a standard below 0.09 but 
do not yet justify a standard below 0.08.

 This brings us, finally, to Petitioners' challenges to the 
secondary ozone NAAQS. According to Petitioners, the sec-
ondary NAAQS are unlawful because EPA failed to account 
for factors other than ozone--including "temperature, rainfall, 
and pests"--that affect crop-yield. Ozone Pet'rs' Br. at 56 
(internal quotation marks and citations omitted). This is 
unreasonable. EPA had no more obligation to consider cli-
matic conditions and pests in "evaluat[ing] whether its new 
[secondary] standard would measurably improve crop yield," 
id., than to consider automobile accidents and malnutrition in 
evaluating whether its new primary standard would measur-
ably improve public health. The Clean Air Act directs EPA 
to protect public welfare from adverse effects of ozone and 
other pollutants; the Agency cannot escape that directive 
simply because ozone wreaks less havoc than temperature, 
rainfall, and pests.

 Citing various CASAC comments regarding the " 'lack of 
relevant plant exposure studies,' " Petitioners next argue that 
EPA estimated the crop-related risks of ozone "crude[ly]." 

Id. (quoting U.S. Envtl. Prot. Agency, EPA-SAB-CASAC-
LTR-96-006, Letter Re: Closure by [CASAC] on the Sec-
ondary Standard Portion of the Staff Paper for Ozone 4 
(1996) ("Second CASAC Ozone Letter")) (internal quotation 
marks and citations omitted). CASAC, however, found more 
than enough data to justify revising the existing secondary 
NAAQS. Second CASAC Ozone Letter at 2 ("[I]t was 
agreed that a secondary NAAQS, more stringent than the 
present primary standard, was necessary to protect vegeta-
tion from ozone."). Moreover, nothing in the Clean Air Act 
requires EPA to wait until it has perfect information before 
adopting a protective secondary NAAQS. Rather, the Act 
mandates promulgation of secondary standards requisite to 
protect public welfare from any "anticipated adverse effects 
associated with" regulated pollutants, 42 U.S.C. s 7409(b)(2) 
(emphasis added), suggesting that EPA must act as soon as it 
has enough information (even if crude) to "anticipate[ ]" such 
effects--just as it did here.

 V.

 The petitions for review are denied except to the extent 
ATA I, ATA II, and Whitman require further action by EPA.

 So ordered.